UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

97 OCT -9 AM 8:52

U.S. DISTRICT COURT
N.D. OF ALABAMA

KIMBERLY KNIGHT and            )
PAULA GREENE,                  )
                               )
        Plaintiffs,            )
                               )
vs.                            )   Civil Action No. CV96-8-510-NE
                               )
WALMART DISCOUNT CITIES and    )
WALMART STORES, INC.,          )
                               )
        Defendants.            )

**ENTERED**

**OCT 0 9 1997**

**MEMORANDUM OPINION**

This action is before the court on the motion for summary judgment of Wal-Mart Stores, Inc.[1]  Plaintiffs claim that Wal-Mart discriminated against them on the basis of gender in violation of: Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e et seq.; and, the Equal Pay Act, 29 U.S.C. § 206(d).  Upon consideration of the motion, pleadings, briefs, and evidentiary submissions, the court determines that Wal-Mart's motion is due to be granted.

**I.  STATEMENT OF FACTS**

**A.    Paula Greene**

**1.    Allegations of discrimination**

Plaintiff Paula Greene was hired on April 6, 1992 as a sales clerk in the health and beauty aids department of the Cullman, Alabama Wal-Mart store.  (Greene deposition at 11.)  In November of that year, Greene requested and received a transfer to the "weekend

---

[1]The answer filed by "Wal-Mart Stores, Inc." on May 9, 1996, states "there is no legal entity known as 'Walmart Discount Cities.'" (Answer ¶¶ 5 and 6.) Plaintiffs have neither controverted that assertion nor amended their complaint.

crew," where she worked with plaintiff Kimberly Knight.  (*Id.* at 13; Knight deposition at 21.)  The weekend crew primarily stocks merchandise and displays, and works during the evening hours of Thursdays through Sundays.

On March 7, 1994, Greene met with weekend crew supervisor Rhonda Young and store manager Gary Martin to address her declining productivity.  (Greene deposition at 50.)  Martin suggested that Greene transfer to the day shift, on which she could receive more supervision.  (*Id.*)  Greene declined the suggestion and was not transferred to the day shift — although some two to three months later, in late May of 1994, she was transferred to "night receiving," to replace an employee who was ending her employment with Wal-Mart.  (*Id.* at 16, 50, 53.)  The primary duty of the night receiving crew is to unload inventory from incoming trucks.  (*Id.* at 13.)

Greene's claim of gender discrimination in job assignments is based on the assertion that her supervisor in night receiving, Candy Mauldin, required men to perform heavy-lifting tasks, while limiting women to light duty assignments.  (*Id.* at 34-35.)  It should be noted, however, that Greene testified women nevertheless performed much of the "men's work." (*Id.* a 35-36.)  In fact, Greene admitted that: she performed men's work; she considered no jobs less desirable than others; and, it did not matter to her which jobs she was assigned to perform.  (*Id.* at 39-40.)

Greene's promotion claim is based on her impression that "females don't seem to go much above department manager." (*Id.* at

45.) Even so, Greene testified she did not seek any promotions, and did not know of anyone who was promoted. (*Id.* at 24-25.)

Greene's pay discrimination claim is based on a statement allegedly made by weekend crew supervisor Rhonda Young to the effect that male employees generally received raises in the range of 45 to 50 cents an hour, while females usually received substantially less: increases in the range of 25 to 30 cents an hour. (*Id.* at 32.) Greene testified, however, that she did not know whether the statement she attributed to Rhonda Young was true, and she had no knowledge of any facts supporting the contention that men were paid more than women. (*Id.* at 32-34.)

Greene also claims her pay was discriminatory, because she was paid less than a male employee named Jeremy Horton. (*Id.* at 17.) At the time of Greene's deposition, she was paid $6.70 an hour while Horton received $7.10 an hour. (*Id.* at 18-19.) Wal-Mart asserts that Horton was paid more because he was hired as a floor maintenance worker, and occupants of that position are paid more than other hourly wage employees due to market demands. (Affidavit of Gary Martin ¶ 10.) Greene does not offer any evidence to the contrary.[2]

## 2.   Allegations of retaliation.

Greene's retaliation claim is based in part upon the conduct of Greene's weekend crew supervisor, Rhonda Young, from March 15, 1994 through May of 1994: *e.g.*, delaying breaks; responding rudely

---

[2]"Plaintiff is without sufficient knowledge to admit or dispute." (Response to Movant's Claimed Undisputed Facts Regarding Plaintiff Paula Greene ¶ 23.)

3

when questioned about breaks; refusing to allow Greene, Kimberly Knight, and Ladon Richardson to work together; and, forcing each to individually perform jobs which allegedly required two workers.[3] (*Id.* at 78.)

She further claims that her November 22, 1996 termination was in retaliation for protected activities.  That termination followed complaints by another employee, Jennifer Griffin, who reported to management that Greene and two other co-workers (Jeremy Horton and Matt Negron) were harassing and physically threatening her. (Parker deposition at 19-20.)  In response, store manager Gary Martin requested that district manager Jay Parker conduct an investigation of the matter.[4] (*Id.* at 9.)  Parker concluded that Greene, Horton, and Negron had engaged in "gross misconduct," and terminated the employment of all three on the same day.[5] (*Id.* at 16-17, 20, 44; Greene deposition at 197-200.)  Wal-Mart typically follows a progressive disciplinary system to correct employee performance, but "gross misconduct," including harassment, may result in immediate termination.  (Greene deposition exhibit 10 at 12-13.)

---

[3]Greene filed a retaliation charge with the EEOC on April 11, 1994.  (Greene deposition exhibit 7.)

[4]Investigations for gross misconduct require the involvement of the district manager.  (Parker deposition at 17-18; Martin deposition at 80-81.)

[5]Parker denied any knowledge of this pending litigation at the time he made the decision to terminate Greene.  (Parker deposition at 26-27; Parker affidavit at ¶ 5.)

4

Greene received a notice of right to sue from the EEOC on December 13, 1995 (Complaint ¶ 16), and commenced this action on February 27, 1996.

## B. Kimberly Knight

### 1. Allegations of discrimination

Plaintiff Kimberly Knight was hired as an hourly-wage associate on the "weekend crew" of the Cullman Wal-Mart store on October 29, 1993. (Knight deposition exhibit 2.) She was transferred to a sales associate position in the store's stationary department during December of 1993. (*Id.* at 18-10.) Gary Martin, the store manager, allegedly told Knight that the transfer was necessitated by budget constraints, but that it was temporary and she would be able to return to the weekend crew on March 6, 1994.[6] (*Id.* at 19.) Knight did not like the fluctuating schedule of the stationary department and requested a position with a fixed schedule. Thereafter she was transferred to a day stocking position.[7] (*Id.* at 20-21.)

On or about March 6, 1994, Knight learned that a new, male employee (Richard Black) had been hired for the weekend crew. (*Id.* at 38.) That same day, she confronted Gary Martin about the alleged failure to reassign her. (*Id.* at 46.) Martin allegedly

---

[6] On March 6, 1994, the Cullman Wal-Mart began receiving inventory six days a week, whereas it previously received inventory five days a week. (Defendant's statement of undisputed facts 9.) Apparently, extra employees were required after March 6, 1994 to accommodate the increased workload.

[7] Day stockers work from 5:30 a.m. until 1:00 or 1:30 p.m., and are responsible for taking stock to the sales floor and placing it on shelves. (Knight deposition at 15-18, 20-1.)

5

replied the male was hired "because [he] is a man, and you are a woman" (id.), and allegedly added: "men are smarter, they're cleaner, and more productive, they are able to work without constant supervision." (Id. at 47.) When Knight took offense, Martin allegedly responded that women had a certain role in the South, which Knight needed to learn, because she was too aggressive. (Id.)

The following day (March 7, 1994), Martin nevertheless offered Knight a position on the weekend crew, and allegedly told her that plaintiff Paula Greene would be moved from the weekend crew, because of her declining productivity. (Id. at 54.) Knight did not immediately accept or reject Martin's offer, but instead told him she needed time to think about it and talk to her husband. (Id. at 55.) The next day (March 8, 1994), Knight informed Martin that she wished to return to the weekend crew, but she did not want to take Greene's job. (Id. at 66.) Martin responded that Greene would remain on the weekend crew. (Id.)

Immediately following Knight's March 8, 1994 conversation with Martin, she and Greene retained counsel and prepared charges of discrimination for the EEOC. (Id. at 78-79.) Those charges were filed on March 15, 1994, and alleged sex discrimination in job assignments, shift assignments, compensation, and promotions. (Id. exhibit 11.)

## 2. Allegations of retaliation.

Knight alleges defendant began to engage in a pattern of retaliatory conduct following the filing of her EEOC charge. She

6

claims the weekend crew supervisor, Rhonda Young, began delaying breaks for the weekend crew, and was rude when Knight asked about the timing of breaks: "screaming" at her on at least one such occasion. (*Id.* at 85-87.) Young allegedly directed co-worker Ladon Richardson to refrain from speaking with Knight or Greene. (*Id.* at 86.) Furthermore, Young allegedly made Knight, Greene, and Richardson individually perform jobs which required two workers, and would not allow them to assist each other. (*Id.* at 91.) Young reportedly said each "should just quit" if they did not like that arrangement. (*Id.* at 88-89, 160.) Young and another employee, Diane Boeckler, would not sit or talk with Knight during breaks (*id.* at 96-97), and Young allegedly stated on several occasions that she "[could not] believe a suit had been filed against Wal-Mart." (*Id.* at 98.)

Because of Young's alleged conduct, Kimberly Knight transferred to the night receiving crew after Memorial Day of 1994,[8] and remained in that position until she resigned. (*Id.* at 121.) In September of 1994, Knight's new supervisor, Candy Mauldin, began dealing with her in an abrupt, "standoffish" fashion. (*Id.* at 117.)

On September 14, 1994, Mauldin held a meeting with Knight and management support team member Anthony George to evaluate Knight's performance. (*Id.* at 120.) She claims Mauldin and George "screamed and yelled" at her (*id.* at 181), told her that she did not

---

[8]Knight filed an amended charge of discrimination alleging retaliation on April 11, 1994. (Complaint ¶ 10.)

7

get along well with others, and criticized her work skills.  (Id. at 122.)  They allegedly told Knight to "shut up" when she tried to take part in the evaluation, and stated she would receive a below average evaluation with no raise.[9]  (Id. at 122-23.)  When Knight attempted to end the evaluation, Mauldin and George would not allow her to leave until she signed her evaluation form.  (Id. at 126-27.)

Knight submitted a resignation letter to Mauldin on September 26, 1994, and received a notice of right to sue from the EEOC on November 30, 1995.  She commenced this action on February 27, 1996.

## II.  EQUAL PAY ACT AND DISPARATE TREATMENT CLAIMS

Plaintiffs'    amended    complaint    alleges    "defendants discriminated against [them] in promotions, compensation, raises, evaluations, job assignments, shift assignments, and other terms, conditions and privileges of employment."  (Amended complaint ¶¶ 30, 41.)  Defendant moves for summary judgment on all claims, but plaintiffs only respond to the retaliation claim, and clearly indicate that they only seek to recover for retaliation.  Paula Greene contends her termination on November 22, 1996 was in retaliation for the present litigation (plaintiffs' brief at 21), and, Kimberly Knight asserts that her resignation amounted to a constructive discharge in retaliation for filing a charge of discrimination with the EEOC.  (Id. at 25.)

---

[9]In fact, Knight actually received a satisfactory evaluation and a raise. (Knight deposition at 127.)

8

Because plaintiffs only respond to defendant's retaliation arguments, summary judgment is appropriate on all other claims. *See Brewer v. Purvis*, 816 F. Supp. 1560 (M.D. Ga. 1993), *aff'd*, 44 F.3d 1008 (11th Cir. 1995)("Summary judgment is appropriate since Plaintiff failed to respond to [defendant's] argument on this issue"); *see also Wiley v. Earl's Pawn & Jewelry, Inc.*, 950 F. Supp. 1108, 1113 n.4 (S.D. Ala. 1997); *Southern Nevada Shell Dealers Ass'n v. Shell Oil*, 725 F. Supp. 1104, 1109 (D. Nev. 1989); *Valluzzi v. United States Postal Service*, 775 F. Supp. 1124, 1125 (N.D. Ill. 1991). Even so, as the following discussion demonstrates, the court agrees with defendant that there are no genuine issues of material fact with regard to the other claims.

**A.  Equal Pay Act**

To establish a *prima facie* case under the Equal Pay Act plaintiffs must demonstrate that defendant pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. *Meeks v. Computer Associates International*, 15 F.3d 1013, 1018 (11th Cir. 1994). Plaintiffs fail to meet the "fairly strict standard" of proof required by the Equal Pay Act,[10] because they have not pointed to any male comparators, or offered proof of equal skill, effort or responsibility under similar working conditions. Defendant offers

---

[10]*Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992).

9

evidence on wages paid to employees Jeremy Horton[11] and Eddie Tawbush,[12] but that evidence is insufficient to determine if those employees performed equal work on jobs requiring equal skill, effort, and responsibility under similar working conditions. Thus, plaintiffs fail to establish a *prima facie* case of violation of the Equal Pay Act, and summary judgment is appropriate on those claims.

**B.   Title VII - Disparate Treatment**

    **1.   Paula Greene**

        **a.   Promotions**

Greene's failure to promote claim is based solely upon her *ad hominem* observation that "females don't seem to go much above department manager." (Greene deposition at 45.) Greene could not identify any employees who were promoted into any position, however, and could not recall seeking any promotions herself. (*Id.* at 24-25.) Greene produced no other evidence regarding her promotion claim, and this court concludes summary judgment is appropriate. *See Jones v. Gerwens*, 874 F.2d 1534, 1538 (11th Cir. 1989)(when a plaintiff fails to make out a *prima facie* case, no inference of discrimination arises and summary judgment is appropriate).

        **b.   Job/duty assignments**

Apparently, Greene's job assignment claim is based upon her impression that male and female members of the receiving crew were

---

[11]See Movant's Initial Submission in Response to Exhibit D of the Court's Order (Document No. 26) at 12-13.

[12]*Id.* at 27.

**10**

required to perform different duties:  men lifted heavy objects, whereas women did not.  (Greene deposition at 34-36.)  Greene testified during deposition, however, that women frequently performed "men's work."  (Id. at 35-36.)  Furthermore, she testified that she considered all duties equally desirable, and that it did not matter "one way or the other" which jobs she was assigned to do. (Id. at 36, 39-40.)  Thus, Greene cannot demonstrate that the alleged discriminatory job assignments affected a term, condition, or privilege of her employment, and summary judgment is appropriate.

### c.   Shift assignments

Greene has no claim for discriminatory shift assignment:  she merely "believe[d] that [defendants] were going to move me out of this job because of my sex."  (Greene deposition exhibit 8: EEOC charge of discrimination (emphasis supplied).)  Nevertheless, Greene admits she was never transferred to the day shift. (Plaintiff's response to defendant's statement of undisputed facts 12.)  Therefore, there is no genuine issue of material fact, and summary judgment is due to be granted.

### d.   Gender-based wage discrimination

The sole basis for Greene's Title VII compensation claim is the fact that she was paid less than Jeremy Horton.  Horton was hired into a floor maintenance position, however, and such workers usually received higher hourly wages due to market demands.  (Gary Martin affidavit ¶¶ 10-11.)  Horton later transferred from the maintenance position and retained his previous rate of pay.

11

Greene, nevertheless, did not controvert defendant's assertion of a market-based, nondiscriminatory reason for the pay differential, and summary judgment is appropriate.

### 2.   Kimberly Knight

#### a.   Promotions

Knight was personally aware of only two promotions during her tenure with Wal-Mart, but admitted she did not believe she should have received either.  (Knight deposition at 239-42.)  She presents no other facts related to her failure to promote claims; therefore, the court concludes Knight fails to prove a *prima facie* case, and summary judgment is appropriate.

#### b.   Job/duty assignments

The court's review of the record reveals Knight's only claim for discriminatory job assignment is her allegation that she, Paula Greene, and Ladon Richardson were required by weekend crew supervisor Rhonda Young to individually perform two-person jobs. Young, however, is a female.  Thus, Greene must show that Young held her to an "unauthorized standard" not required of men, in order to establish discriminatory intent.  *See Billingsley v. Jefferson County*, 953 F.2d 1351, 1355 (11th Cir. 1992)(black county commissioner imposed "unauthorized standards not required of white employees" on black plaintiffs); *United States v. Crosby*, 59 F.3d 1133, 1135 n.4 (11th Cir. 1995)(no evidence that black supervisor "held members of his own race to a higher standard of conduct than members of another race").  Greene does not fulfill that burden, because Ladon Richardson is a male employee subjected to the same

**12**

treatment as Greene, and there is no evidence that Rhonda Young imposed unauthorized standards on women; therefore, summary judgment is appropriate.

### c.    Shift assignments

Knight only alleges disparate treatment in shift assignments, because Gary Martin initially refused to transfer her from the stationary department to the weekend crew. Even so, Martin granted the transfer the following day; therefore, there was no adverse employment action to form the basis of a Title VII claim, and summary judgment is appropriate.

### d.    Gender-based wage discrimination

Knight's wage discrimination claim is based completely on hearsay that a male employee, Eddie Tawbush, received a "big" raise (35 to 50 cents an hour), but she did not. (Knight deposition at 140.) Defendant acknowledges that Tawbush received a 35 cent raise as a result of his June, 1994 performance evaluation (Martin affidavit ¶11), but claims the raise was appropriate, because Tawbush received an above-standard evaluation from his female supervisor. (Id. ¶¶ 7, 11.) Knight offers no evidence to dispute defendant's explanation, and summary judgment is appropriate.

### III.   RETALIATION CLAIMS

The familiar burden-shifting scheme developed by the Supreme Court for Title VII disparate treatment claims applies equally well to Title VII retaliation claims. See Donnellon v. Fruehauf Corporation, 794 F.2d 598, 600, reh'g denied, 800 F.2d 267 (11th Cir. 1986). Thus, each plaintiff must first establish a prima

13

*facie* case by showing: (1) statutorily protected expression; (2) an adverse employment action;[13] and (3) a causal linkage between the protected expression and the adverse action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

If plaintiffs establish a *prima facie* case, then at the second stage of analysis the burden of production shifts to defendant to rebut the presumption of intentional discrimination by articulating legitimate, nondiscriminatory reasons for the contested employment action. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). If defendant does so, then in the final step of the inquiry each plaintiff must have an opportunity to show by a preponderance of the evidence that defendant's stated reasons merely are pretexts for unlawful, discriminatory motives. *Id*.

## A. Paula Greene

Paula Greene filed a charge of discrimination with the EEOC, instituted this action, and thereafter was terminated; therefore, she has satisfied the first two elements of a *prima facie* case.[14] To demonstrate a causal linkage between the events, Greene must "only establish that 'the protected activity and the adverse action were not wholly unrelated.'" *Goldsmith*, 996 F.2d at 1163. It is

---

[13]"Adverse employment actions" must be such as rise to the level of "ultimate employment decisions," such as hiring, granting leave, discharging, promoting, and compensating. *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997).

[14]This court rejects Greene's contention that various acts prior to her termination were "adverse employment actions": see Movant's Initial Submission in Response to Exhibit D of the Court's Order (Document 26) at 14-18, which this court ADOPTS.

14

necessary, however, that Greene produce evidence demonstrating that the person who made the decision to terminate her employment had knowledge of her EEOC charge or this action.

> At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action. ... The defendant's awareness of the protected statement, however, may be established by circumstantial evidence.

*Id.* (citations omitted); *see also Phillippeaux v. Fashion Institute of Technology*, No 96-7533, 1996 WL 734038 at *1 (2d Cir. Dec. 23, 1996) (plaintiff failed to show that the "actual decision-makers" had knowledge of his complaints); *Ellis v. Morehouse School of Medicine*, 925 F. Supp. 1529, 1550 (N.D. Ga. 1996)(no evidence that school official knew plaintiff planned to file a complaint); *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 957 (N.D. Ga. 1995)("there is no evidence that the individuals responsible for making [employment decisions] were aware that Plaintiff had contacted the EEOC"); *Robinson v. Lockheed Corporation*, No. 1:90-CV-2750-GET, 1991 WL 487236 at *9 (N.D. Ga. Oct. 7, 1991)("plaintiff must prove that the persons who allegedly retaliated against him were aware of the previous EEOC charge").

Greene offers no evidence demonstrating that her decisionmaker — defendant's district manager, Jay Parker — knew of her EEOC charge or this action, or that any other Wal-Mart employee with knowledge of those facts influenced his decision.   Instead, she offers only the following argument:

> Obviously, the plaintiffs cannot produce concrete evidence of Parker's thoughts or knowledge other than what he testified to in his deposition.  However, it defies common sense that a District Manager would not

15

> know about federal litigation pending against Walmart as
> the result of behavior in one of his own stores.  The
> veracity of Parker's testimony in this regard is a
> question of credibility about a material fact that should
> be decided by a jury.

(Plaintiffs' brief at 25.)  Greene nevertheless had ample
opportunity during discovery to develop circumstantial evidence of
Parker's knowledge.  For example, her "common sense" argument would
be much more persuasive if accompanied by evidence demonstrating
that Parker regularly received notices of all EEOC charges or
actions filed by employees working in those stores within his
district, rather than a conclusory supposition that "surely he did."

Moreover, the time between Greene's last protected activity
and her termination indicates there is no causal linkage.  "[W]here
a substantial period of time has elapsed between the two events —
engagement in the protected activity and the adverse employment
action — the causal connection is less likely to exist absent
evidence demonstrating a connection between the two events."
*Breech v. Alabama Power Company*, 962 F. Supp. 1447, 1461 (S.D. Ala.
1997).  Defendant argues there is no causal link, because Greene
admits[15] she suffered no discriminatory treatment between May of
1994 (when she filed her EEOC charge of discrimination) and her
termination on November 22, 1996: a temporal expanse of some two
and one-half years.  Greene commenced this action on February 27,
1996, however.  Therefore, the temporal distance between protected
activity and her termination actually was less than nine months.
Even so, that time expanse still is sufficiently wide to eliminate

---

[15]Greene deposition at 85-86, 143.

16

any causal connection. *See, e.g., Stanton v. Allied Signal, Inc.*, No 96-3647, 1997 WL 210810 at * 1 (6th Cir. Apr. 25, 1997)(no causal link where plaintiff terminated eight months after filing charge); *Khouri v. Frank Cuneo Hospital*, No. 90-1680, 1991 WL 46406 at *6 (7th Cir. 1991)(No causal link where plaintiff filed EEOC charge eight months prior to discharge); *Rio v. Runyon*, No. 94-7078, 1997 WL 532498 (S.D. Fla. June 16, 1997)(seven months too remote); *Garcia-Paz v. Swift Textiles, Inc.*, 873 F. Supp. 547, 560-61 (D. Kan. 1995)(interval of eight months does not give rise to a reasonable inference of causal connection).

Even if Greene were deemed to have established a causal linkage, and thereby a *prima facie* case, she still fails to rebut defendant's legitimate, nondiscriminatory reason for her termination. Jay Parker testified that his investigation revealed "gross misconduct" by Paula Greene, Jeremy Horton, and Matt Negron, sufficient to merit immediate termination of all three employees. "The law is clear that, even if a Title VII claimant did not in fact commit the violation with which [s]he is charged, an employer successfully rebuts any *prima facie* case ... by showing that it honestly believed the employee committed the violation." *Jones v. Gerwens*, 874 F.2d 1534, 1539 (11th Cir. 1989). Parker's testimony establishes an "honest belief" that Greene, Horton, and Negron physically threatened and verbally harassed other employees. Therefore, Greene bears the burden of demonstrating that Parker's alleged belief is unworthy of credence. *Elrod v. Sears, Roebuck and Company*, 939 F.2d 1466, 1470 (11th Cir. 1991).

17

Greene attempts to meet her burden by arguing that she was
terminated merely for using profanity, that no other employee was
terminated for profanity, and that Wal-Mart failed to follow its
progressive discipline policy before termination. (Plaintiffs'
brief at 23-25.) The fatal flaw in that argument is Greene's
opinion that she was terminated merely for using profanity. To
support that opinion, Greene relies upon an exit interview form
which states she was terminated for "violation of company policy in
regards to harassment using profanity in the work place." (Parker
deposition exhibit 9.) Another exit interview form states Greene
was terminated for profanity and "threatening associates." (*Id.*
exhibit 10.) When questioned about the discrepancies between the
two forms, Parker confirmed that Greene was fired for reasons other
than the mere use of profanity:

Q. [by plaintiffs' counsel] Was that one of the specific
reasons that Paula was fired was for threatening
associates?

A. For creating the hostile environment in the work place.
(Parker deposition at 59.)

In fact, Parker's investigation revealed a pattern of
harassment by Greene, including profanity as well as threats
against other employees.

[Jennifer Griffin] complained that about from the first
day, that she had been abused by — verbally by Matt,
Jeremy, and Paula, that they cursed, called her — she
was called snotty bitch, a snobby bitch, by all three,
that they used terms like, "You better be scared of us
and if you're scared, well, then everything will be all
right." That Paula Greene, I think, said that in
particular. ...

. . .

18

Jennifer was crying and obviously very emotional.

(*Id.* at 20.)

> [Griffin] said that they — Paula used the word "fuck" and "God damn" and that she said things like, "I'm going to crack your shit," and such as that. ... [S]he was afraid to go to the lounge and ... she was afraid to come to work, because ... of the fact that Paula and Jeremy and Matt all would taunt her and harass her from the time — by using language as I've described already.

(*Id.* at 23-24.)

> [Wal-Mart employee Kevin Atchley] said that they had what they called a family — that Matt, Jeremy, and Paula said they were family and they were brothers and sisters. And if you weren't in the family, well then you were sort of in trouble, and that they made him an honorary cousin to the family because — he thought that it was because of his size and he didn't intimidate easily, that they made him an honorary member.

(*Id.* at 28.)

> [Wal-Mart employee Karla Bailey stated that] when she went on night receiving that the three — Matthew, Jeremy, and Paula — began treating her in a way that she felt like was hostile and intimidating and such to her.

(*Id.* at 30.)

> After we concluded talking to [Griffin and Bailey] on that day, we had to let these two associates out of the receiving door, because they were afraid to go out the front door for fear Matt, Paula, or Jeremy, one or all three would be out there.

(*Id.* at 37-38.)

> This was pretty gross misconduct in my opinion based on the preponderance of what I thought was evidence — the statements from Jennifer Griffin and Karla who, you know, gave me statements that they were intimidated and frightened and even afraid to come to work and such as this, that the three of them were always together as family, and that they were — they cursed and as a matter of fact, I believe it was Karla that said she was even — she would cut her breaks short if she knew they were in the lounge. So it was just a case of really creating a sort of hostile work environment and inappropriate action and conduct there.

19

(*Id.* at 44.)

> [Greene told Parker] "I was just joking." ... [but] foul language is never appropriate in the work place. And then to tell someone you are going to crack their shit as a connotation that may you are going to do something to them as far as hurt them physically, as far as, you know, that you are going to kick my ass, which she told someone in there, that doesn't seem like it's joking to me. I mean, it wasn't perceived, anyway, by Jennifer and Karla as being joking.

(*Id.* at 39.)

> Because of the nature of their actions and what was done and said and because of the intimidation and the fact it was obvious from the other associates there, I felt like [termination] was the appropriate action to take.

(*Id.* at 47.)

Wal-Mart's disciplinary policy recognizes that gross misconduct can result in immediate termination. In fact, Greene's statement of undisputed facts quotes a portion of Wal-Mart's policy allowing immediate termination for "major infractions." ("Opposing parties' additional claimed undisputed facts regarding plaintiff Paula Greene" 8.) The fact that Horton and Negron were simultaneously terminated is compelling evidence that there was no retaliatory motive behind defendant's termination of Greene. She produces no evidence to allow a factfinder to disbelieve defendant's explanation, *Combs v. Plantation Patterns*, 106 F.3d 1519, 1531 (11th Cir. 1997), and summary judgment accordingly is appropriate.

## B.  Kimberly Knight - Constructive Discharge

### 1.  Constructive discharge standard

To prove that she was constructively discharged on September 26, 1995, Knight must establish that her working conditions were so

20

intolerable that a reasonable person[16] in her position would feel compelled to resign. *E.g., Kilgore v. Thompson & Brock Management*, 93 F.3d 752, 754 (11th Cir. 1996). Thus, "plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Landgraf v. USI Film Products*, 968 F.2d 427, 430 (5th Cir. 1992)(citing *Pittman v. Hattiesburg Municipal Separate School District*, 644 F.2d 1071, 1077 (5th Cir. 1981)), *cert. granted in part*, 507 U.S. 908, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993), *aff'd*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Consequently, courts require proof of "aggravating factors," such as "a continuous pattern of discriminatory treatment." *Dudley v. Wal-Mart Stores, Inc.*, 931 F. Supp. 773, 811 (M.D. Ala. 1996); *See also Pittman*, 644 F.2d at 1077 (reversing constructive discharge judgment because there were no aggravating factors)[17]; *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997)(requiring aggravating factors); *Schnidrig v. Columbia Machine, Inc.*, 80 F.3d 1406, 1411 (9th Cir. 1996)(requiring aggravating factors such as a continuous pattern of discrimination); *James v. Sears, Roebuck and Co., Inc.*, 21 F.3d 989, 992 (10th Cir. 1994)(requiring aggravating factors); *McCann v. Litton Systems, Inc.*, 986 F.2d 946, 951 (5th Cir. 1993)(citing

---

[16] A reasonable person is one who does not "assume the worst" or "jump to conclusions too fast." Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987).

[17] In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

21

*Pittman* and requiring aggravating factors). In attempting to do so, Knight alleges six instances of allegedly retaliatory conduct:

>    a.  Her crew supervisor, Rhonda Young, delayed breaks for the entire weekend crew, and was rude when Knight asked about breaks, "screaming" at her on one occasion. (Knight deposition at 85-87, 108).
>
>    b.  Young allegedly told Knight's co-worker, Ladon Richardson, to refrain from speaking to Greene. (*Id.* at 94-95.)
>
>    c.  Young told Knight, Greene, and Richardson to work in departments by themselves, and required each to perform two-person jobs while in those departments.
>
>    d.  Young and co-worker Diane Boeckler would not sit or talk with Knight during breaks. (*Id.* at 96-97.)
>
>    e.  After Knight's transfer to the night crew, crew supervisor Candy Mauldin allegedly became "standoffish" two weeks before the September 15, 1994 evaluation. (*Id.* at 116-17.)
>
>    f.  Mauldin and management support team member Anthony George yelled at Knight, told her to "shut up," and criticized her work skills during the September 15, 1994 evaluation. (Greene deposition at 120-24.)

### 2. No continuous retaliatory conduct

Knight admits she suffered no allegedly adverse conduct for at least three months: the period between her transfer from the weekend crew after late May of 1994, and Mauldin's "standoffish" behavior in early September of 1994. (Knight deposition at 116-17, 121.) Thus, the court finds no <u>continuous</u> pattern of discriminatory treatment, and summary judgment is appropriate.

### 3.   No intolerable working conditions

Even if the conduct directed towards Knight were considered continuous, it nonetheless is not sufficient to establish intolerable working conditions. The September 15, 1994 evaluation is the most favorable evidence for Knight, but her own comments on the evaluation form demonstrate that she did not perceive the evaluation as retaliatory:

> I feel our receiving supervisors evaluation of my work performance is biased & based on her unprofessional and strictly personal opinion. There is extreme favoritism on our crew between herself and personal friends and past employees.

(Knight deposition exhibit 3.)  Furthermore, that one incident of shouting and criticism could not create intolerable working conditions. *French v. Eagle Nursing Home, Inc.*, No. CV. 3-96-67, 1997 WL 456581 at * 7 (D. Minn. August 5, 1997)("While [defendants] may have behaved unpleasantly toward [plaintiff] by criticizing her job performance and shouting at her on October 12, 1993, these conditions alone, as a matter of law do not constitute an intolerable work environment"). Moreover, the remaining incidents of alleged retaliation should not have played any significant role in Knight's decision to resign. *Young v. Mariner Corporation*, No. 87-HM-5322, 1991 WL 172927 (N.D. Ala. Apr. 23, 1991)(making faces, ostracism, and premature departures from lunchroom by other employees were "relatively trivial compared to the drastic action of resigning from a job .... It was unreasonable for [plaintiff] to let such incidents play any significant role in her decision to resign"). The court concludes the actions criticized by Knight

23

were not sufficiently severe or pervasive to constitute
harassment, and certainly did not rise to the level of "aggravating
factors" required for constructive discharge.  Thus, no reasonable
person in Knight's position would have felt compelled to resign,
and summary judgment is appropriate.[18]

### IV.  CONCLUSION

For the foregoing reasons, the court concludes defendant's
motion is due to be granted.  An order consistent with this
memorandum opinion will be entered contemporaneously herewith.

DONE this the 9th day of October, 1997.

_____
United States District Judge

_____

[18]See Movant's Initial Submission in Response to Exhibit D of the Court's
Order (Document No. 26) at 27-37, which this court ADOPTS.

**24**